696 P.2d 693

The **TANNER COMPANIES**, an Arizona corporation, Petitioner,

v.

**SUPERIOR COURT** of the State of Arizona, Maricopa County, and Honorable Linda Scott, Judge; and the City of Phoenix, a political subdivision of the State of Arizona; Rein, Schultz & Dahl of Illinois, Inc., an Illinois corporation; and Robert Rein, Respondents.

No. 17552–SA.

Supreme Court of Arizona,
En Banc.

March 8, 1985.

Snell & Wilmer by Daniel J. McAuliffe, Donald D. Colburn, Judy M. Miller, Phoenix, for petitioner.

Andy Baumert, Phoenix City Atty. by Jesse W. Sears, Phoenix, for City of Phoenix.

Campana & Horne by Susan L. Elkins, Phoenix, for respondents.

HOLOHAN, Chief Justice.

This special action arises out of the award of a contract by the City of Phoenix to Robert Rein (Rein) and Rein, Schultz & Dahl of Illinois, Inc. (Dahl), a joint venture, for the construction of a highway. The superior court upheld the contract award following a challenge by Tanner Companies (Tanner). A special action by Tanner was filed in this court. We accepted jurisdiction, vacated the judgment of the superior court, and issued an order directing that the contract be awarded to the petitioner, Tanner, with a written opinion to follow.

The essential facts are that pursuant to a Notice to Contractors by the City of Phoenix inviting bids for construction of a certain roadway within the city, Rein and Dahl submitted the low bid of $733,961. Tanner submitted the next lowest bid, $753,881, which was less than five percent higher than Rein and Dahl's. Each bidder claimed the five percent resident contractor taxpayer preference pursuant to A.R.S. § 34–241(A).[1] Tanner then filed a bid protest with the City alleging, *inter alia*, that Rein and Dahl had not paid taxes during the preceding two years sufficient to qualify for the five percent statutory preference. On April 4, 1984, Tanner's protest was considered in an administrative hearing before an assistant city attorney acting as hearing officer. By memorandum decision, the hearing officer recommended that the city council award the contract for the project to Rein and Dahl, the low bidder,

---

1. A.R.S. § 34–241(A) provides:

In awarding the contract for work to be paid for from public funds, bids of contractors who have satisfactorily performed prior public contracts, and who have paid state and county taxes within the state for not less than two successive years immediately prior to submitting a bid on a plant and equipment such as is ordinarily required for performance of the contract for which the bid is submitted, or on other real or personal property in the state equivalent in value to such plant, shall be deemed a better bid than the bid of a competing contractor who has not paid such taxes, whenever the bid of the competing contractor is less than five per cent lower, and the contractor making a bid, as provided by this section, which is deemed the better bid, shall be awarded the contract. We have upheld challenges to the constitutionality of this statute in *Schrey v. Allison Steel Manufacturing Co.*, 75 Ariz. 282, 255 P.2d 604 (1953), and *City of Phoenix v. Superior Court*, 109 Ariz. 533, 514 P.2d 454 (1973). The issue of constitutionality of the statute is not before us today.

based on a finding that both the Rein and Dahl joint venture and Tanner met the requirements of A.R.S. § 34–241(A). Since each was entitled to the statutory preference, the contract should be awarded to the lower bid. On April 18, the Phoenix City Council awarded the contract to Rein and Dahl. On April 19, Tanner filed a special action in the Superior Court of Maricopa County. An interlocutory stay was obtained, and an accelerated hearing was held on April 26. The following day, judgment was entered granting the City of Phoenix's motions for dismissal and summary judgment. We accepted jurisdiction of this special action for the purpose of clarifying the superior court's erroneous construction of A.R.S. § 34–241(A).

A contractor must meet three requirements to be entitled to a contract award under the resident taxpayer preference: (1) satisfactory performance of prior public contracts; (2) payment of state and county taxes for not less than two successive years immediately prior to submitting a bid "on a plant and equipment such as is ordinarily required for performance of the contract ... or on other real or personal property in the state equivalent in value to such plant;" and (3) submission of a bid within five percent of the lowest bid on a project by contractors not entitled to the preference. A.R.S. § 34–241(A).

Before examining the superior court's findings on the statutory requirements, we address Tanner's claim that the formation of a joint venture solely for the purpose of satisfying the statutory terms constitutes a "sham or ruse," and should accordingly disqualify Rein and Dahl from the resident contractor preference. Both the city hearing officer and the trial court found that Rein and Dahl had entered into a verbal agreement to form a joint venture prior to submitting its bid. The bid application clearly indicated that submission was on behalf of the joint venture. A written joint venture agreement was formalized following the city hearing on Tanner's protest. The agreement provided for joint responsibility in bid preparation and submission, joint and several liability on all bonds required by the city, and sharing of costs and expenses, project management, and profits and losses.

■ To constitute a valid joint venture under Arizona law, there must exist: (1) a contract; (2) a common purpose; (3) a community of interest; (4) an equal right to control; and (5) participation in the profits and losses. *Ellingson v. Sloan*, 22 Ariz. App. 383, 527 P.2d 1100 (1975). Based upon this standard, we can find no abuse of discretion in the trial court's ruling that the verbal joint venture agreement, formalized in writing following the city hearing, constituted a valid joint venture under Arizona law. Nor does the fact that Rein and Dahl entered into the agreement merely to qualify for the resident contractor preference invalidate the contractual arrangement as a "sham or ruse."

■ Joint venturers share full liability in agency and in tort. *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982). A joint venture, which shares the benefits and liabilities of the separate acts of each individual joint venturer, should also be allowed to benefit from the qualifications of each participant. The use of the joint venture form was rare enough at the time of the original enactment of the statute in 1933 that it is unlikely the legislature considered it in drafting the statute. The intent of the legislature in enacting the statute was to give an advantage to resident over nonresident contractors because they had made a contribution through tax payments "to the funds from which they are to reap a benefit." *Schrey v. Allison Steel Mfg. Co., supra*, 75 Ariz. at 287, 255 P.2d at 607. A second rationale was to provide continuous work for Arizona residents and businesses. *Mardian Construction Co. v. Superior Court*, 113 Ariz. 489, 492, 557 P.2d 526, 529 (1976). We see no reason why a bona fide joint venture which, through its participants, fulfills the statutory requirements regarding performance of prior public contracts and payment of specified in-state taxes should not be treated the same as

other bidders. Thus the joint venture formed for this project, once having been found to be a valid entity, was entitled to the same consideration that a single contractor would get for the purposes of A.R.S. § 34–241(A). It was not a sham merely because it was created with the explicit purpose of qualifying for the preference.

Having established that a qualified joint venture is eligible for the resident contractor preference, we proceed to examine the superior court's application of the statutory requirements to Rein and Dahl. In its petition before this court, Tanner did not contest Dahl's completion of prior public contracts within the meaning of the statute. We therefore accept the superior court's finding that this requirement has been satisfied. We also accept the determination that Rein and Dahl's bid was the lowest bid absent the five percent preference. At issue then is only whether the superior court correctly applied the prior in-state tax payment requirement to qualify respondents as entitled to the preference. Rein and Dahl as a joint venture claim compliance with the two year in-state tax payment requirement by reason of the following tax payments:

1. Vehicular taxes prorated for part year ownership in 1983 in the amount of $990, and full year 1984 taxes in the amount of $1,853.

2. Personal property taxes as part of rental payments on equipment for 1983 and 1984.

3. Real estate taxes on a personal winter residence owned by Rein, cash valued in 1983 at $131,576, with 1982 taxes paid of $598 and 1983 taxes of $117.

In determining statutory qualification on the basis of these tax payments, the superi-

or court found that the prorated vehicular taxes did not satisfy the two year requirement. The court found, however, that the real estate taxes paid by Rein satisfied the statute.[2] While we agree with the superior court that the 1983 prorated vehicular taxes (in concert with the 1984 payment) do not satisfy the statutory requirement, we disagree that the real property taxes meet the clear statutory language requiring real or personal property tax payments "equivalent in value" to plant and equipment "such as is ordinarly required for performance of the contract...." A.R.S. § 34–241(A).

The trial court determined that the city hearing officer erred in finding that Dahl's payment of a prorata share of its 1983 vehicle tax in addition to its full 1984 vehicle tax fulfilled the requirement of A.R.S. § 34–241(A) that the bidder pay "state and county taxes within the state for not less than two successive years immediately prior to submitting a bid." The trial court relied upon *Speer Construction Co. v. Arizona Dept. of Transportation*, 124 Ariz. 208, 603 P.2d 100 (App.1979). While we agree with the result of the trial court, we decline to adopt the reasoning of *Speer, supra* as it is unnecessary to the disposition of the instant case. *Speer* stands for the proposition that the language "paid state and county taxes within the state for *not less than two* successive years prior to submitting a bid" (emphasis supplied) does not require a bidder claiming the statutory preference to have paid taxes for a time period of 24 months or 730 days. According to *Speer*, the two-year requirement is satisfied "if an amount equal to two years' taxes has been paid within the time allowed by the appropriate taxing statute ... notwithstanding the fact that the elapsed time from the first payment is less than two years." *Id.* at 211, 603 P.2d at 103. Be-

---

**2.** As to the taxes paid indirectly through lease payments on equipment owned by Border Machinery Company, the superior court left undisturbed the summary dismissal by the city hearing officer. Because Martin Eastin of Dahl admitted by deposition to the trial court that Border Machinery was the title owner and the true taxpayer on the equipment, we agree that Dahl

cannot be credited for those tax payments. To hold otherwise would allow two or more companies to claim a preference based on the same tax payment, and would require public agencies to perform the substantial task of tracing tax payments through one or more intermediate conduits to assure that timely Arizona tax payments were made.

cause the tax payment at issue does not constitute an "amount equal to two years' taxes," we find no reason to proceed further. We hold that a prorata tax payment, in effect a tax payment for only part of a year, may be counted for the purpose of § 34–241(A) only for the fraction of the year on which the tax was paid. Thus, the vehicular taxes are not applicable.

■■■ The only other taxes which might qualify the joint venture for the preference are those paid by Rein in the past two years on his personal winter residence in Scottsdale. The preference statute requires taxes to be paid "on a plant and equipment such as is ordinarily required for performance of the contract for which the bid is submitted, *or on other real or personal property in the state equivalent in value to such plant....*" A.R.S. § 34–241(A) (emphasis added). Rein and Dahl claim the statutory preference by reason of real estate taxes on Rein's personal winter residence, with a 1983 cash value of $131,576, on which taxes of $598 and $117 were paid in 1982 and 1983, respectively. On the basis of deposition testimony by Mr. Martin Eastin, president of Dahl, the value of plant and equipment necessary to complete the project can be conservatively estimated at $350,000. Standing alone, the real estate taxes paid on a condominium unit, arguably used for business purposes and valued significantly less than the plant and equipment necessary to complete the bid, cannot satisfy the statutory terms. In *Mardian, supra* this court found that the intent of the resident contractor preference statute was to insure that preference be given to bona-fide resident contractors. Implicit in the opinion was a determination that neither an administrative hearing officer nor a reviewing court would inquire into the sufficiency of the taxes paid so as not to discriminate against smaller contractors bidding on public contracts. We have difficulty with the rather narrow reading given to the statutory language in *Mardian.* Failure to examine the sufficiency of the taxes paid on real and personal property to determine whether it is at least equivalent in value to plant and equipment necessary to complete the bid could result in frustration of the purposes and intent of the statute. It was never the legislative intent that any contractor, wherever situated, could ally itself with a resident taxpayer who has paid taxes on a home for two years and thus qualify for a preference on public construction contracts. We find such a result untenable. We hold, therefore, that in order to satisfy the terms of A.R.S. § 34–241(A) concerning taxes paid on "real or personal property equivalent in value to such plant," a bidding contractor, at the time of bid, must have paid taxes for two years on such real or personal property in an amount equal to a reasonable valuation of the plant and equipment necessary to complete the bid.

Each party will bear its own attorney's fees.

HAYS and CAMERON, JJ., concur.

FELDMAN, Justice, dissenting.

In the last half-century economic and industrial conditions in Arizona have changed significantly. As a result, the statutory procedures at issue here have become so outmoded as to have lost all rational basis. A.R.S. § 241 was a product of the depression. In its consideration of the statute, prior to adopting it in 1933, the legislature explicitly stated the act's purpose:

WHEREAS, many residents of the State of Arizona are without employment and many contractors ... within the state of Arizona are without work, or without a market for their products, and non-resident contractors bring into the state non-resident employees to remain and become a burden on the public after their contracts are completed, and many resident contractors, producers and dealers are unable to pay their taxes, and the provisions of this act will tend to relieve such unemployment, to prevent the increase of the unemployed, and to aid in the collection of taxes ...

H.B. 37, 11th Legis., Reg.Sess. (1933, State Library and Archives).

Obviously, the statutory grant of a benefit to resident contractors and the concomitant disability imposed upon non-resident contractors constitutes a privilege to the former and a discrimination against the latter. Any law which has such an effect must be examined in light of the equal protection provisions of the fourteenth amendment of the United States Constitution and article 2, § 13 of the Arizona Constitution. The latter specifically proscribes the grant of "privileges ... which, upon the same terms, shall not equally belong to all citizens or corporations." Thus, the legislature may discriminate between classes only if all those in a given class are treated equally *and* the classifications are not unreasonable. *Arizona Downs v. Arizona Horsemen's Foundation*, 130 Ariz. 550, 637 P.2d 1053 (1981). Where the matter being regulated involves economic interests, the least stringent analysis, known as the rational basis test, is applied to determine the validity of a discriminatory statute. *Id.* at 555, 637 P.2d at 1058. That test permits the courts to uphold constitutionality if the statute has some conceivable, rational basis which furthers a legitimate governmental interest. *Id.*

Assuming, arguendo, that the quoted legislative statement of purpose creates a legitimate public interest justifying state action, we still must inquire whether the statute has any rational relation to that interest. In examining the constitutionality of this statute in 1953, we acknowledged that the statute showed "partiality" and granted privileges "not granted to others," but found the statute constitutional because it was "not whimsical, capricious, or arbitrary." *Schrey v. Allison Steel Manufacturing Co.*, 75 Ariz. 282, 286, 255 P.2d 604, 606 (1953).

The statute no longer meets the test. Any rational relation between the statute and achievement of the stated legislative goals has been destroyed by changes in the construction industry since 1933. Today, large construction companies do business in many states. Award of a contract to a "non-resident" contractor would not result in hiring significantly less Arizona labor than if the award was made to Tanner. It would be senseless for any company to import labor if it were available in Arizona. On the other hand, if such labor were not available in Arizona, nothing in the statute prohibits Tanner from importing workers. Why would labor imported by Tanner be less likely to remain in Arizona "and become a burden on the public after their contracts are completed" than labor imported by a non-resident contractor? We are a much more transient nation than we were in 1933. The "home base" of construction workers in modern times depends upon economic conditions and job availability more than upon the home-office location of the contractor. Construction labor is not kept on the general contractor's payroll between jobs. Most labor, in fact, is provided by subcontractors, and the statute does not require a general contractor which has received the preference to limit itself to using Arizona subcontractors.

Nor does determining "residency" for preference purposes on the basis of tax payments on property within the jurisdiction make sense any longer. The facts of this case illustrate the manner in which the statute operates. There has never been a joint venture. It is a fiction created by an ingenious lawyer and hurriedly formed by "oral agreement" just before the bid submission. It was "formalized" by written agreement the day *after* the contract was awarded. The purpose of this joint venture between Mr. Rein and Rein, Schultz & Dahl (RSD) is obvious. Mr. Rein is the chief executive officer of RSD, an Illinois contracting corporation which otherwise could not qualify for the Arizona residential contractors' preference. The joint venture between Rein and RSD was formed so that Mr. Rein's ownership of a winter residence in Arizona might be used to qualify the joint venture for the preference. The absurdity of this is highlighted by the fact that RSD had performed a number of construction contracts in Arizona prior to the one in question. Since these jobs were performed on an Indian reservation, the equipment used was not taxed by the state.

In addition, the corporation has a ten year lease on Arizona land where it has located its construction plant. The property is leased, so RSD pays no real estate taxes. Because it had paid no taxes, RSD was not eligible for the preference. Nevertheless, RSD's payroll (almost $50,000 per week) for its Arizona jobs largely went to Arizona employees, most of whom were Arizona Indians taken off the unemployment rolls. Under the statutory scheme, however, hiring unemployed residents did not qualify RSD for the preference designed to promote the hiring of unemployed Arizona workers. All of this forced Mr. Rein and RSD to resort to the legal legerdemain of forming a joint venture on the day prior to the submission of bids.

The majority opinion does not disapprove of such hocus pocus. It merely holds that the joint venture is not entitled to a preference because Mr. Rein's condominium had too low a value. If Mr. Rein had been smart enough to buy a more expensive condominium—on the Biltmore golf course, for instance—he would have been able to obtain a 5% resident contractor's preference. The majority fails to explain how this would promote the welfare of Arizona labor, encourage the hiring of unemployed residents, and prevent the importation of non-resident workers who would become burdens upon the public.

In recent years we have had other examples of the mischief promoted by this statute. Many contractors now use leased equipment, but paying rent on leased equipment usually does not involve direct tax payment and does not qualify one as a contractor entitled to the preference. (*See* majority opinion at 694, n. 1). Thus, a contracting firm operated by an agency of an Arizona Indian tribe was held not entitled to a preference—and was not awarded a contract. *See White Mountain Apache Tribe v. Superior Court* (No. 16455–SA, jurisdiction declined March 17, 1983). It made no difference that the workers who would have been hired by the tribal agency were unemployed Indians and that Arizona Indians have the highest unemployment rate of any group in Arizona. In another case, an enterprising bidder moved a trailer used as a construction field office across the Colorado River from Winterhaven to Yuma a week before bid opening. This act could qualify a firm for the preference if it could successfully persuade the Yuma County assessor to accept a tender of two years' personal property tax—even though the tax was not owed. *See Brinderson Corporation v. Superior Court* (No. 17352–SA, jurisdiction declined February 2, 1984).

The majority chooses to ignore these examples of irrationality but does acknowledge that it "was never the legislative intent" to permit a non-resident contractor to "ally itself" with a residential taxpayer and thus qualify for a resident contractor preference on public building contracts. *Ante* at 697. It finds "such a result untenable." *Id.* It attempts to cure the problem by disapproving the "narrow reading" given the statute in *Mardian Construction Co. v. Superior Court*, 113 Ariz. 489, 557 P.2d 526 (1976) and construing the statute to require that a preference not be given a bidder whose taxes were paid on "real and personal property" unless the value of such property is reasonably equal to the valuation of the plant or equipment necessary for the job. It does make better sense, I suppose, that Mr. Rein get the preference if his warm-weather condominium is worth a minimum of $350,000 than to allow it if the residence is worth only $130,000. What the majority overlooks is that our constitution does not permit us to uphold a legislative grant of special privilege on such illusory grounds. We may uphold the grant of such privilege only if we can find that the legislative system is "not whimsical, capricious, or arbitrary" (*Schrey, supra*) and has at least some rational relationship to a proper legislative goal.

The majority has failed to inform us how the latter test is met by this statute. In its desire to uphold a statute which no longer makes sense, the court has closed its eyes to the reality of the marketplace. All this, of course, would be of but passing interest except for the harm done to the public.

First, we deal with public funds; the contract should go to the lowest qualified bidder, not the bidder with the most expensive condominium in Carefree or Scottsdale. Second, the subterfuges to which bidders are put in order to qualify for the preference result in frequent controversy and litigation. Thus, public agencies are forced to appoint hearing officers, conduct hearings, and adjudicate conflicting claims on the preference issues before awarding contracts. The expense, delay, and waste attendant to all of this is unnecessary, unseemly, and contrary to the public interest.

This statute violates equal protection. It is an anachronism whose usefulness ended thirty years ago. The time has come to bury it and leave the legislature to devise some rational method of promoting employment of Arizona's unemployed construction workers.

I dissent and would hold the statute unconstitutional.

GORDON, Vice Chief Justice:

I concur in Justice Feldman's dissent.